CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAY 17 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

**TONY HILL,**
    Plaintiff,

v.

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**
    Defendant.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:05cv0097

**MEMORANDUM OPINION**

BY: GLEN M. WILLIAMS
Senior United States District Judge

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Tony Hill, ("Hill"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and 1381 *et seq.* (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Hill protectively filed his current applications for DIB and SSI on or about July 24, 2003, alleging disability as of April 18, 2001, due to deteriorated disc disease, severe arthritis in his legs, hypertension, black lung disease, asthma, severe anxiety, depression, panic attacks, personality disorders, sleep disorder, excessive weight gain, back and leg pain, "nerves" and an inability to sit or stand for long periods of time or to bend, stoop or kneel. (Record, ("R."), at 56-59, 64, 308-12.) His claims were denied initially and on reconsideration. (R. at 36-38, 41-44, 314-16, 321-23.) Hill then requested a hearing before an administrative law judge, ("ALJ"). (R. at 45.) The ALJ held a hearing on November 1, 2004, during which Hill was represented by counsel. (R. at 324-66.)

By decision dated February 23, 2005, the ALJ denied Hill's claims. (R. at 5-31.) The ALJ found that Hill was insured for DIB purposes through September 30,

2003.[1]  (R. at 29.)  Furthermore, the ALJ found that Hill had not engaged in substantial gainful activity since April 18, 2001. (R. at 29.) The ALJ found that Hill suffered from degenerative disc disease of the lumbar spine, an adjustment disorder with mixed depression and anxiety features, chronic obstructive pulmonary disease, ("COPD"), and obesity, all of which constituted severe impairments, but that Hill did not have an impairment or combination of impairments listed at or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29-30.) The ALJ also found that Hill's allegations regarding his limitations were not totally credible. (R. at 30.) The ALJ found that Hill had the residual functional capacity to perform a limited range of light[2] work, but that Hill was unable to perform his past relevant work. (R. at 30.) Specifically, the ALJ found that Hill could perform light work diminished by an ability to only occasionally stoop, kneel, crouch and crawl, an inability to push and/or pull with the lower extremities, by moderate limitations on his abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, to work in coordination or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length or rest periods, to interact appropriately with the

---

[1]Thus, for purposes of Hill's DIB claim, he must show the existence of a disability on or prior to September 30, 2003.

[2]The regulations define light work as work that involves lifting objects weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

general public, to ask simple questions or request assistance and to accept instructions and respond appropriately to criticism from supervisors and by mild to moderate limitations on his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 30.) Based on Hill's age, education, past work and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were a significant number of jobs in the national economy that Hill could perform, such as bench assembly and as a sorter/tester or packager. (R. at 30-31.) Thus, the ALJ found that Hill was not under a disability as defined by the Act at any time through the date of the decision and was not eligible for benefits. (R. at 31.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2005).

After the ALJ issued his opinion, Hill pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 5-7.) Hill then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on Hill's Motion For Summary Judgment filed March 15, 2006, (Docket Item No. 11), and the Commissioner's Motion For Summary Judgment, filed April 13, 2006. (Docket Item No. 13).

## II. Facts

Hill was born in 1959, (R. at 331), which classifies him as a younger person under 20 C.F.R. §§ 404.1563(c), 416.963(c). Hill has a ninth-grade education, and he has past relevant work experience in the coal industry, which includes work as a track man, a longwall operator and a general inside miner. (R. at 334.)

-4-

Hill testified that his last place of employment was at a construction company in approximately 1999 where he had worked for two or three months until he could no longer handle the demands of the employment (R. at 332-33.) Hill stated that he had previously worked for a coal company from 1981 to 1996 and had held numerous positions with this company including a track man, a longwall operator and a general inside laborer. (R. at 334.)

When asked by his attorney why he believed he could no longer work, Hill testified that it was because of pain in his back and legs, sleeplessness and nerves. (R. at 339.) Hill explained that he suffered from low back pain that radiated down his left leg into his toes. (R. at 339.) Hill stated that his back pain forced him to lie down six or seven hours a day. (R. at 344.) Hill described the pain in his leg as a burning sensation that caused numbness approximately one to two times a day. (R. at 339-40.) Hill stated that nothing alleviated the numbness and pain in his left leg. (R. at 340.) Hill further testified that he used a transcutaneous electrical nerve stimulation, ("TENS"), unit three or four hours a day but that it only slightly helped ease his pain. (R. at 340-41.) Hill added, however, that nothing totally relieved his pain. (R. at 341.) Hill also testified that upon his doctor's recommendation, he had begun using a cane in the spring of 2004. (R. at 341.) Hill stated that the use of a cane helped with walking and prevented him from falling. (R. at 341.) Hill estimated that without the use of a cane, he could stand or walk for only 15 to 20 minutes before he would have to sit. (R. at 342.) Hill also stated that sitting hurt his back and legs but that leaning on a cane lessened some of the pressure on his back. (R. at 342.) Hill testified that he could sit for 15 to 20 minutes before he needed to shift positions

to relieve the pain. (R. at 342-43.) Hill was unsure of the maximum weight he could lift, but stated that he could lift a gallon of milk, although he would never try to lift his grandchild who weighed over 60 pounds. (R. at 343.)

Hill further testified that he had experienced problems with his nerves for the past several years. (R. at 344.) Hill stated that he saw Dr. David Forester, M.D., for treatment of his nerves every eight weeks, which somewhat helped his condition. (R. at 345.) Hill indicated that the medication Dr. Forrester prescribed possibly caused drowsiness. (R. at 347.) Despite treatment and medication, Hill testified that he never wanted to do anything, so he just stayed in his house. (R. at 345.) Hill added that he never wanted to be around people. (R. at 345.)

Hill also complained of constant shortness of breath and an intolerance to fumes and gasses. (R. at 348-49.) However, Hill denied smoking regularly and stated that he smoked approximately half a pack of cigarettes only when he was nervous. (R. at 348.) Hill stated that he had difficulty walking because of shortness of breath. (R. at 348.) Hill claimed that the weather had no impact on whether he experienced shortness of breath. (R. at 348.)

In describing his daily activities, Hill stated that he stayed in his house and never saw visitors. (R. at 345.) Hill denied doing any indoor or outdoor chores. (R. at 345-46.) Hill further denied watching television, listening to the radio, reading or grocery shopping. (R. at 349-50, 352.) Hill testified that he sometimes talked to his wife. (R. at 350.) Hill testified that he only occasionally drove, despite having no restrictions on his driver's license and having no handicapped parking tag. (R. at

-6-

346.) Hill stated that he remained drowsy and sleepy throughout the day because his nerves and back pain interfered with his sleep at night. (R. at 346.) Hill also testified that his sleep deprivation affected his memory and concentration. (R. at 346-47.) Hill stated that bending over to put on his shoes and socks was too painful, so he just slid his feet in his shoes and left them untied. (R. at 342.) Hill also testified that he needed assistance in dressing approximately two to three times a month. (R. at 342.)

When asked about his current medications, Hill stated that he took Lorcet Plus, Robaxin and Ativan and wore Methaderm patches and a back brace. (R. at 343, 347.) Hill also testified that Dr. Jobin gave him an inhaler to treat a breathing condition caused by the presence of rock dust in his lungs. (R. at 344, 348.) Hill stated that he used the inhaler every two to three hours, but still experienced constant shortness of breath. (R. at 348.) Hill testified that he did not suffer any side effects from the medications. (R. at 344.) Hill indicated that Dr. William McIlwain, M.D., had placed the following restrictions on his activities: no lifting items weighing over 25 pounds and no standing, sitting, crawling or pushing and pulling. (R. at 350.) According to Hill, Dr. McIlwain also instructed him to shift positions every two hours when standing or sitting. (R. at 350.)

Bonnie Martindale, a vocational expert, also testified at Hill's hearing. (R. at 353-65.) Martindale described Hill's position as a flag man as "light and unskilled" and the position as a track man as usually "very heavy[3] and semiskilled," although she

---

[3]Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more. If someone can perform very heavy work, he also can perform heavy, medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(e), 416.967(e) (2005).

believed that Hill's testimony suggested that Hill's position as a track man had not been as difficult as semiskilled. (R. at 355.) Martindale described the position of longwall operator as usually "heavy[4] and skilled" but believed that the duties Hill described suggested the position was semiskilled. (R. at 355.) Martindale then described the position of jack setter as "medium[5]" but stated that in this capacity, Hill seemed more of a general laborer, which is a position that is classified as "heavy and skilled" in the Dictionary of Occupational Titles, ("DOT"), but was probably more of an unskilled position. (R. at 356.) Martindale confirmed that skills acquired in the coal mining industry do not transfer to fields outside the coal mining industry. (R. at 356.)

Martindale was then asked to consider a hypothetical individual of Hill's age, education and past relevant work experience who had the residual functional capacity to occasionally lift and/or carry items weighing up to 20 pounds, to frequently lift and/or carry items weighing up to 10 pounds, to stand and/or walk with normal breaks for a total of about six hours of an eight-hour workday and to sit with normal breaks for a total of about six hours in an eight-hour workday. (R. at 356-57.) Martindale was further asked to assume that the individual would be limited in pushing and pulling with his lower extremities, such as in the operation of foot controls, but could frequently climb and balance and occasionally stoop, kneel, crouch and crawl. (R.

_____

[4]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2005).

[5]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

-8-

at 357.) The ALJ also asked Martindale to assume that the individual should avoid all exposure to fumes, odors, dusts, gasses and poor ventilation. (R. at 357.) Martindale testified that, given these restrictions, such an individual could not perform the job of flag man, but could perform other jobs existing in significant numbers in the national economy, including those of a bench assembler, a sorter and a packager. (R. at 357-58.)

The ALJ asked Martindale to further assume that the individual had a moderate limitation in the ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; to maintain regular attendance; to be punctual within customary tolerances; to work in coordination with and proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a good pace without an unreasonable number and length of break periods; to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors; and a mild to moderate limitation on his ability to get along with coworkers or peers without distracting them or exhibiting behavior extremes. (R. at 359.) Martindale stated that the same jobs would be available to such an individual even with the additional nonexertional mental limitations because the positions required simple and unskilled work, which was not precluded by the additional limitations. (R. at 359-60.)

Martindale was then asked to consider a hypothetical individual of Hill's age, education and past relevant work experience, but who had the residual functional

-9-

capacity to stand for an hour at a time; to sit between one to two hours at a time with breaks for body position changes; and to lift and carry items weighing up to 10 pounds frequently and up to 25 pounds occasionally. (R. at 360.) Martindale stated that there were sedentary jobs available in the regional and national economies that such an individual could perform including an assembler, an inspector/sorter and other production worker. (R. at 361.) Specifically, Martindale identified 54,000 bench assembly jobs available in the national economy and 1,000 in the regional economy, 14,000 inspector/sorter jobs available in the national economy and 330 in the regional economy and 56,500 other production jobs available in the national economy and 1,450 in the regional economy. (R. at 361.) Martindale confirmed that the need to use a cane would not preclude these jobs because they offer a sit/stand option; however, she clarified that if the jobs required standing at least part of the time, the use of cane would prevent employment because the jobs required the use of both hands. (R. at 365.)

The ALJ next asked Martindale to consider a hypothetical individual of Hill's age, education and past relevant work experience, but who had a fair ability to follow work rules; to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out simple job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 362.) Martindale was further asked to assume that this individual had a poor or no ability to relate to co-workers; to deal with the public; to deal with work stresses; and to understand, remember and carry out detailed, but not complex ,job instructions. (R. at 362.) Martindale testified that with these limitations there would be no jobs available in the national or regional

-10-

economies because of the inability to deal with others and work stresses and the inability to carry out detailed job instructions. (R. at 363.)

In rendering his decision, the ALJ reviewed records from Bristol Regional Medical Center; Dr. German Iosif, M.D.; Dr. Minaben D. Patel, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; The Forester Clinic, P.C.; Dr. Muhammad Javed, M.D.; Appalachian Orthopaedic Associates; and Bristol Neurosurgical Associates. Hill's counsel also submitted additional medical records from Appalachian Orthopaedic Associates and Bristol Neurosurgical Associates to the Appeals Council.[6]

On April 13, 1998, Hill underwent a discogram of the L4-5 level of the spine at Bristol Regional Medical Center, ("BRMC"), which showed normal discometrics. (R. at 215-18.) The pattern posteriorly showed Hill's annulus to be barely protruding beyond the margins of his vertebra and, in fact, not into the intrathecal space at all. (R. at 215.) The anterior to posterior and lateral projections both showed slight layering, but without much dispersal at all. (R. at 215.)

On October 15, 1999, Hill had an MRI taken of his lumbar spine, which showed some disc degeneration at L5-S1 and a small disc bulge at this level centrally and slightly to the left of midline. (R. at 220.) The attending physician noted that the bulge was probably insignificant, and the levels above L5-S1 were within normal

---

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-7), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-11-

limits. (R. at 220.) No other abnormalities were noted. (R. at 220.)

Dr. McIlwain referred Hill to Wellmont Rehabilitation Services at BRMC for work conditioning so that Hill could regain the lifting skills needed to return to his target job of general laborer/coal miner. (R. at 227.) Hill began physical therapy on December 15, 1999, at which time he was given a good prognosis for rehabilitation. (R. at 227.) Hill's physical therapy regimen consisted of work conditioning five days a week for four to six weeks starting out at three hours per day, gradually increasing to at least five to six hours per day. (R. at 228.) His treatment included therapeutic exercises, lumbar range of motion and flexibility exercises, hamstring stretching, trunk stabilization exercises, general strengthening, conditioning and endurance activities and work simulation. (R. at 228.) Throughout his treatment, Hill often complained of low back pain and leg pain but expressed that overall, he believed he was improving to some degree. (R. at 221-59.) Consistently, Hill's physical therapist reported that he was pleased with Hill's efforts and willingness to participate in the program. (R. at 221-59.) On February 18, 2000, progress notes indicated that, despite Hill's symptom magnification, he was able to complete all tasks on the functional capacity evaluation without significant difficulty. (R. at 254.) Hill gradually increased his tolerance to work to seven hours a day and met or exceeded all goals set except for the ability to walk a mile and a half or two miles without stopping. (R. at 259.) However, Hill routinely demonstrated the ability to walk one mile without stopping, usually twice a day. (R. at 235, 238, 244, 246, 248-53, 255-59.) Hill completed the work conditioning program on February 25, 2000. (R. at 259.)

Case 1:05-cv-00097-GMW-PMS   Document 15   Filed 05/17/06   Page 12 of 35   Pageid#: 94

From January 10, 2000, to March 6, 2003, Hill received treatment from BRMC primarily for complaints related to degenerative disc disease of the lumbar spine, COPD and anxiety. (R. at 99-138.) On July 11, 2000, Hill had x-rays taken of his lumbar spine, which revealed mild central bulging at the L5-S1 level. (R. at 260.) The bulging disc did contact the ventral surface of the thecal sac, but did not appear to create significant distortion by CT criteria. (R. at 260.)

Hill also received treatment from Dr. McIlwain at Appalachian Orthopaedic Associates, P.C., for degenerative disc disease. (R. at 261-66, 269.) On March 27, 2001, Dr. McIlwain noted that he would treat Hill's condition conservatively and continued Hill's use of Monopril, Soma and Lortab. (R. at 261.) On July 31, 2001, Hill returned to Appalachian Orthopaedic Associates complaining of pain and numbness in the index finger of his right hand; however, Dr. McIlwain could find no significant reason for the problem. (R. at 261-62.) Dr. McIlwain noted that Hill had a decrease in the disc height at the L5-S1 level. (R. at 262.) On May 20, 2002, Hill returned to Appalachian Orthopaedic Associates complaining of continued pain in his back and left leg. (R. at 263.) Upon an examination, Dr. McIlwain noted that Hill's reflexes were 2+ and equal, while his straight leg raise was tight. (R. at 263.) Dr. McIlwain advised Hill that he needed to obtain a new corset. (R. at 263.) Overall, Dr. McIlwain found Hill stable and referred him to Dr. John Marshall, M.D., for maintenance of pain management. (R. at 263.) Dr. McIlwain injected Hill with a dosage of Celestone and Toradol and recommended that he continue to exercise and stretch. (R. at 263.)

Hill visited with Morgan Lorlo at Bristol Neurosurgical Associates on March

6, 2002, for a re-check regarding his low back condition. (R. at 306-07.) Lorlo found Hill's motor, sensory and deep tendon reflexes stable. (R. at 306.) Lorlo refilled Lorcet Plus and Robaxin for Hill's back condition and recommended that Hill visit a rheumatologist for treatment of his gout. (R. at 306.)

On June 18, 2002, Hill visited The Forester Clinic, P.C., for an initial psychiatric evaluation. (R. at 204.) Hill complained of restlessness, difficulty concentrating, persistent worrying, fatigue, depressed mood, insomnia and poor concentration, but he denied any suicidal ideation. (R. at 204.) Hill also related that when he became nervous, welts would appear that caused itchiness. (R. at 204.) Dr. David L. Forester, M.D., noted that Hill's mood was depressed and anxious but that he was cooperative and his affect was appropriate. (R. at 204.) Dr. Forester completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) for Hill. (R. at 271-73.) Dr. Forester concluded that Hill would have a fair ability to follow work rules, to use judgment, to interact with supervisors, to function independently and to maintain attention and concentration, but a poor or no ability to relate to co-workers, to deal with the public and to deal with work stresses. (R. at 271.) In making performance adjustments, Dr. Forester found that Hill would have a fair ability to follow simple job instructions, but a poor or no ability to follow detailed or complex job instructions. (R. at 272.) Furthermore, Dr. Forester concluded that Hill had a good ability to maintain personal appearance, a fair ability to behave in an emotionally stable manner and to relate predictably in social situations and a poor or no ability to demonstrate reliability (R. at 272.) Dr. Forester based his determinations on previous reports and his own personal assessment. (R. at 271-73.)

On July 9, 2002, Hill returned to The Forester Clinic with complaints of irritability, persistent worrying, decreased pleasure in activities, agitation, feelings of worthlessness, fatigue and a persistent depressed mood. (R. at 203.) Dr. Forester assessed Hill with major depression and a generalized anxiety disorder. (R. at 203.) Hill was placed on Paxil, Vistaril, Ativan and Lorcet Plus. (R. at 203.) On October 16, 2002, Hill reported that his insomnia had worsened. (R. at 201.) Hill was prescribed Vistaril, Effexor, Prilosec, Ativan and Lorcet Plus. (R. at 201.) These medications were continued on November 25, 2002, January 10, 2003, and March 10, 2003. (R. at 198-200.)

Hill visited Dr. Marshall on July 31, 2002, for a re-check appointment. (R. at 304-05.) Hill related that Dr. McIlwain wanted to leave Hill's entire pain management to Dr. Marshall. (R. at 304.) Dr. Marshall refilled Hill's prescriptions for Lorcet Plus and Robaxin. (R. at 304.) On November 6, 2002, Hill reported that he did well with Lorcet Plus and Robaxin, but that his symptoms were a little worse. (R. at 302-03.) Dr. Marshall found that Hill was stable with increased symptoms, but probably secondary to increased activity level superimposed on his deconditioning. (R. at 302.) Dr. Marshall refilled Hill's prescriptions for Lorcet Plus and Robaxin and encouraged Hill to continue his home exercise program. (R. at 302.) On January 29, 2003, Hill reported that his symptoms were stable, and the pain medicine helped him remain functional. (R. at 300-01.) Dr. Marshall continued Hill's use of Lorcet Plus and Robaxin. (R. at 300.)

On March 6, 2003, Hill underwent an x-ray and CT scan of his lumbar spine at BRMC. (R. at 99-100.) Images revealed that Hill's L5 segment demonstrated

-15-

partial sacralization, and there was narrowing of his L5-S1 disc, which could have represented degenerative change or physiologic variant. (R. at 100.) There also was flexion and extension projections that demonstrated no definite subluxations, and there was slight anterior wedging of T11 and T12, which appeared chronic. (R. at 100.) Otherwise, the study was unremarkable. (R. at 100.) The CT scan showed minimal anular bulging at L4-L5, which is a frequent finding in patients Hill's age. (R. at 99.) No other abnormalities were noted from the CT scan. (R. at 99.)

On May 2, 2003, Hill visited The Forester Clinic for refills on his medications. (R. at 195.) He was assessed with degenerative disc disease of the lumbar spine, gastroesophageal reflux disease, ("GERD"), COPD and an anxiety disorder. (R. at 195.) Hill was prescribed a Proventil inhaler, Prevacid, Ativan and Lorcet Plus. (R. at 195.) Hill returned to The Forester Clinic on May 23, 2003, complaining of sleep disturbance, irritability and a depressed mood. (R. at 197.) Dr. Forester prescribed Ativan, Lexapro, Vistaril and Nexium. (R. at 197.) On July 18, 2003, Hill visited The Forester Clinic with reports of decreased interest in activities and irritability. (R. at 191.) Dr. Forester prescribed Remeron, Ativan, Lexapro and Vistaril. (R. at 191.)

On July 16, 2003, Hill reported to Dr. Marshall that his symptoms were fairly stable, although he would like to receive medication to help him sleep better. (R. at 296-97.) Dr. Marshall continued Hill's use of Lorcet Plus and Robaxin and prescribed trazodone to help Hill sleep. (R. at 296.)

Hill returned to Appalachian Orthopaedic Associates on September 15, 2003, primarily for a follow-up on his back pain. (R. at 264-65.) Hill reported that his back

-16-

pain was worse in the mornings. (R. at 264.) Dr. McIlwain injected Hill with Celestone and Toradol, gave him a cane to use when walking on uneven ground and advised him to do only light to moderate work. (R. at 264.) Dr. McIlwain determined that Hill's should not lift items weighing more than 20 to 30 pounds, and he should be allowed to be in a position where he could move his back and stretch his legs. (R. at 264.) Dr. McIlwain stated that Hill could stand, walk and climb moderate ladders and stairs. (R. at 264-65.)

On November 20, 2003, Dr. German Iosif, M.D., examined Hill and completed an internal medicine report based on the examination. (R. at 139-48.) Dr. Iosif found Hill to be alert and oriented, although somewhat depressed-looking. (R. at 141.) An examination of Hill's cervical spine was unremarkable, but there was tenderness on palpation of the lumbar paraspinal muscular compartments. (R. at 141.) Dr. Iosif found flexion of Hill's dorsolumbar spine to be limited to 30 degrees, extension of his dorsolumbar spine to be limited to 10 degrees and right and left lateral flexion limited to 15 degrees. (R. at 142.) Hill refused to proceed with further flexion or extension due to complaints of pain. (R. at 142.) X-rays of Hill's chest showed mild and nonspecific interstitial fibrotic changes in his perihilar regions, while an x-ray of his lumbar spine was normal. (R. at 142.) Dr. Iosif also considered an MRI of Hill's lumbar spine obtained on November 21, 1997, which indicated the existence of a mild protrusion of material from the L5-S1 intervertebral disc, which was centered to the left of the midline. (R. at 142.) This MRI also revealed the existence of markedly decreased signal in the L5-S1 intervertebral disc indicating degeneration, while it showed the caliber of Hill's spinal canal was normal, and there was no evidence of neuroforaminal impingement. (R. at 142.)

Dr. Iosif diagnosed Hill with degenerative disc disease of the lumbar spine with complaints of a chronic nature present at rest and exacerbated by passive and active mobilization of that structure. (R. at 142.) Dr. Iosif also found that Hill suffered from chronic depression and an anxiety syndrome, the latter with significant manifestations. (R. at 142.) Dr. Iosif stated that the functional impairments related to Hill's musculoskeletal condition were likely to prevent him from performing the physical demands of a coal miner. (R. at 142.) Dr. Iosif further indicated that Hill could stand for up to one hour at a time, sit for between one and two hours with breaks for body position changes and could lift and carry items weighing up to 10 pounds frequently and up to 25 pounds occasionally. (R. at 142.) Dr. Iosif also stated that Hill suffered from a significant psychosocial functional impairment and that he could not envision Hill interacting in a positive way within a work environment. (R. at 143.)

On December 10, 2003, Dr. Minaben D. Patel, M.D., evaluated Hill and completed a psychiatry report. (R. at 149-53.) Hill complained of pain in his lower back, which radiated into his left leg. (R. at 149.) Hill related that he could not sit, stand or walk for significant periods of time. (R. at 149.) Hill also complained of a nervous condition that was brought about by a back injury. (R. at 150.) Hill explained that he became aggravated and nervous easily and often. (R. at 150.) Hill further indicated that he suffered from depressive symptoms, but denied any active suicidal or homicidal ideation. (R. at 150.) Hill indicated that he had seen a psychiatrist every two months for the previous two years. (R. at 150-51.) Dr. Patel found Hill alert and oriented to three spheres and cooperative. (R. at 151.) Dr. Patel further noted that Hill's insight was fair and his judgment intact. (R. at 152.) Hill

-18-

was able to do serial seven subtraction and to correctly repeat five digits backwards. (R. at 152.) Dr. Patel's final impression was that Hill suffered from an adjustment reaction with mixed emotional features, a back problem, a breathing problem, high blood pressure, financial problems and chronic pain. (R. at 152.) Dr. Patel assessed Hill with a Global Assessment of Functioning, ("GAF"), score of 60.[7] (R. at 152.) Dr. Patel recommended that Hill continue seeing a psychiatrist and concluded that Hill was able to manage his own funds. (R. at 153.)

On December 12, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment for Hill. (R. at 154-61.) Dr. Johnson concluded that Hill could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for about six hours in an eight-hour workday. (R. at 155.) Dr. Johnson also found that Hill's ability to push and/or pull was limited in his lower extremities, namely his back. (R. at 155.) In making his assessment, Dr. Johnson relied on Hill's allegations of degenerative disc disease, severe arthritis in his legs, high blood pressure, black lung disease, asthma requiring home nebulizer treatment, severe anxiety, depression, panic attacks, personality disorder, sleep disorder, excessive weight gain and an inability to sit or stand for long periods of time or to bend, stoop, kneel or lift items weighing more than 25 pounds. (R. at 155.) Dr.

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

Case 1:05-cv-00097-GMW-PMS    Document 15    Filed 05/17/06    Page 19 of 35    Pageid#: 101

Johnson further relied on the x-rays and MRI taken on March 6, 2003, and an examination dated November 20, 2003, which was normal except for some tenderness on palpation of Hill's paraspinal muscular component. (R. at 155-56.) Dr. Johnson also found that Hill could frequently climb and balance, but could only occasionally stoop, kneel, crouch or crawl. (R. at 156.) Dr. Johnson found that Hill had no manipulative limitations, visual limitations or communicative limitations. (R. at 157-58.) However, Dr. Johnson did find that Hill should avoid all exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 158.)

Dr. Johnson found Hill's allegations partially credible based on the medical evidence of record. (R. at 159.) Dr. Johnson indicated that Hill was overweight and had some tenderness of the lumbar spine, but had no severe nerve or muscle damage that would cause such severe pain as to be totally disabling. (R. at 159.) Dr. Johnson added that Hill's breathing was not severely restricted and he should be able to do light exertional-type work that avoided stooping, crawling and fumes. (R. at 159.) It was noted that Dr. Johnson's findings conflicted with Dr. Iosif's conclusion that Hill could stand for only one hour a day; however, Dr. Johnson indicated that the medical evidence or record did not show conditions that prevented Hill from standing six hours out of an eight-hour workday. (R. at 160.) Dr. Johnson's findings were affirmed on March 10, 2004, by Dr. Gary Parrish, M.D., another state agency physician. (R. at 161.) On January 20, 2004, a medical consultant[8] also reviewed the Physical Residual Functional Capacity Assessment and agreed with Dr. Johnson's limitations, except for Dr. Johnson's finding of environmental limitations. (R. at

---

[8]The signature of the medical consultant who reviewed the Physical Residual Functional Capacity Assessment dated December 12, 2003, is illegible, and his/her name is not found anywhere else on the review.

162.-63.) The medical consultant indicated that there was no objective or historical evidence of such limitations and, instead, found that Hill could work in the customary ventilated workplace. (R. at 162.)

Hugh Tenison, Ph.D, a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), for Hill on December 15, 2003. (R. at 164-77.) In the PRTF, Tenison concluded that Hill had an affective disorder and a coexisting nonmental impairment that required referral to another medical speciality. (R. at 164.) Tenison determined that Hill's affective disorder, an adjustment reaction with mixed emotional features, did not precisely satisfy the diagnostic criteria for disability benefits. (R. at 167.) Tenison found that Hill was mildly limited in activities of daily living, moderately limited in maintaining social functioning and mildly to moderately limited in maintaining concentration, persistence or pace. (R. at 174.) Tenison found that Hill was not limited by repeated episodes of decompensation. (R. at 174.) Tenison indicated that Hill's allegation of disability was partially credible, as his irritability from pain was likely to result in mild to occasionally moderate difficulties in interacting socially and in maintaining persistence and concentration. (R. at 176.) Tenison stated that these problems would not, however, preclude simple unskilled work. (R. at 176.) A medical consultant, agreed with the PRTF in its entirety. (R. at 186-87.)

Tenison also completed a Mental Residual Functional Capacity Assessment for Hill. (R. at 180-83.) Tenison found that Hill was not significantly limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to

-21-

sustain an ordinary routine without special supervision, to make simple work-related decisions, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to travel to unfamiliar places or use public transportation or to set realistic goals or make plans independently of others. (R. at 180-81.) Tenison found that Hill was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance and to accept instructions and respond appropriately to criticism from supervisors. (R. at 180-81.) Tenison also found that Hill was advancing from no significant limitation to a moderate limitation in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 180-81.) Tenison found no evidence of limitation in Hill's ability to be aware of normal hazards and take appropriate precautions. (R. at 181.) Tenison's findings were affirmed on March 8, 2004, by Joseph Leizer, Ph.D., another state agency psychologist. (R. at 182.) A medical consultant, agreed with the Mental Residual Functional Capacity Assessment in its entirety. (R. at 184-85.)

On April 13, 2004, Hill visited Appalachian Orthopaedic Associates for continued back pain and trigger point injections. (R. at 266.) Dr. McIlwain noted a

-22-

large weight gain, but found Hill's x-rays to be stable. (R. at 266.) Dr. McIlwain injected Hill with Celestone and Marcaine and refilled his dosage of Zanaflex. (R. at 266.)

On April 5, 2004, Hill visited Dr. Muhammad Javed, M.D., for a follow-up appointment. (R. at 211.) Hill reported that Ativan helped his nerves and Nexium helped his GERD. (R. at 211.) Dr. Javed assessed Hill with tenderness in his upper left molar and GERD. (R. at 211.) Hill was prescribed E-Mycin, Nexium, albuterol and Ativan. (R. at 211.)

On May 5, 2004, Hill visited Bristol Neurosurgical Associates for a six-month check-up. (R. at 267.) Hill reported that his regimen of Percocet, Zanaflex and Robaxin did not work as well as his earlier regimen. (R. at 267.) Therefore, Dr. Jim C. Brasfield, M.D., ordered Hill to discontinue Percocet and Zanaflex and instead take Robaxin, Lorcet Plus and trazodone. (R. at 267.)

Hill visited The Forrester Clinic on September 20, 2004, reporting that he was unsure whether his medications were working because he only sometimes slept well. (R. at 270.) Dr. Forester noted that Hill displayed multiple symptoms of major depression and general anxiety disorder and prescribed Hill Klonopin, Lexapro, Vistaril, Gabitril and clonazepam. (R. at 270.)

On September 28, 2004, Hill returned to Appalachian Orthopaedic Associates complaining of continued lumbar pain from lumbar degenerative disc disease. (R. at 278-79.) Hill indicated that pain in his left leg kept him awake at night and he also

-23-

experienced low back pain. (R. at 278.) Hill reported that his last SI joint injection helped a great deal, but that he did not want to get another injection. (R. at 278.) Hill stated that Lorcet Plus no longer eased his pain, and he did not believe that Robaxin helped either. (R. at 278.) Straight leg raises were generally negative, but they did cause Hill some discomfort at full extension. (R. at 278.) Dr. McIlwain suggested that Hill use Zanaflex instead of Robaxin and Tylenol 4 instead of Lorcet Plus. (R. at 278.) Dr. McIlwain also gave Hill injections of Celestone and Toradol and ordered a CT scan and epidural steroid. (R. at 279.) Hill was advised that if he experienced progression of his symptoms, he should consider whether surgery was an acceptable option. (R. at 278-79.)

Dr. Neal A. Jewell, M.D., completed an independent medical evaluation of Hill on September 2, 2004. (R. at 281-88.) Hill complained of central and left lower back pain, left lower extremity pain in his toes and infrequent right lower extremity pain to the posterior mid thigh and popliteal region. (R. at 281.) Hill explained that the pain was worse in the mornings and increased with prolonged sitting, standing and walking. (R. at 281.) Hill reported that he had to change positions frequently. (R. at 281.) Dr. Jewell concluded that Hill had suffered a moderate lumbar sprain on March 27, 1991, which caused persistent low back pain, left lower extremity pain and degenerative lumbar disc disease, primarily in the L4-5 and L5-S1 levels with minimal/small disc protrusions. (R. at 286.) Dr. Jewell concluded that Hill was capable of returning to and performing many aspects of his pre-injury employment. (R. at 286.) Dr. Jewell also found that current clinical examinations demonstrated that Hill's subjective complaints were not well-supported by objective findings. (R. at 286.) Dr. Jewell referred to the February 2000 functional capacity evaluation,

-24-

which indicated that Hill could occasionally lift items weighing up to 50 pounds and surmised that without evidence of significant deterioration since that time, Hill could still perform at those levels. (R. at 287.) It also was noted that Dr. Jewell did not believe that Hill's disability was related to a work injury in 1991 because many doctors had thereafter found Hill capable of returning to work, and Hill did indeed return to work until 1996. (R. at 287.) Dr. Jewell indicated that deconditioning was likely a cause of Hill's continuing disability. (R. at 287.)

After viewing radiologic studies on Hill from BRMC on September 24, 2004, Dr. Jewell determined that there was no major injury in terms of anatomical changes associated with Hill's 1991 injury and no deterioration over the early treatment time in the few years following the injury. (R. at 289.) Dr. Jewell also found that without any evident major change in Hill's radiologic status through the study in October 1999 and the current study in March 2003, there was no need for invasive treatment. (R. at 289.)

Hill visited Dr. Marshall for a six-month check-up appointment on October 20, 2004. (R. at 290-91.) Hill indicated that he was interested in trying a pain patch to avoid further epidural steroid injections and in remaining on Lorcet Plus instead of switching to Tylenol 4. (R. at 290.) Dr. Marshall noted that Hill was stable with an antalgic gait. (R. at 290.) Dr. Marshall gave Hill a Lidoderm pain patch to wear and refilled Hill's prescriptions of Lorcet Plus and trazodone. (R. at 290.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 and Supp. 2005); 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 23, 2005, the ALJ denied Hill's claims. (R. at 5-

-26-

31.) The ALJ found that Hill was insured for DIB purposes through September 30, 2003. (R. at 29.) Furthermore, the ALJ found that Hill had not engaged in substantial gainful activity since April 18, 2001. (R. at 29.) The ALJ found that Hill suffered from degenerative disc disease of the lumbar spine, an adjustment disorder with mixed depression and anxiety features, chronic obstructive pulmonary disease, ("COPD"), and obesity, all of which constituted severe impairments, but that Hill did not have an impairment or combination of impairments listed at or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29-30.) The ALJ also found that Hill's allegations regarding his limitations were not totally credible. (R. at 30.) The ALJ found that Hill had the residual functional capacity to perform a limited range of light work, but that Hill was unable to perform his past relevant work. (R. at 30.) Specifically, the ALJ found that Hill could perform light work diminished by an ability to only occasionally stoop, kneel, crouch and crawl, an inability to push and/or pull with the lower extremities, by moderate limitations on his abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, to work in coordination or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length or rest periods, to interact appropriately with the general public, to ask simple questions or request assistance and to accept instructions and respond appropriately to criticism from supervisors and by mild to moderate limitations on his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 30.) Based on Hill's age, education,

-27-

past work and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were a significant number of jobs in the national economy that Hill could perform, such as bench assembly and as a sorter/tester or packager. (R. at 30-31.) Thus, the ALJ found that Hill was not under a disability as defined by the Act at any time through the date of the decision and was not eligible for benefits. (R. at 31.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2005).

Hill argues the ALJ's decision was not based on substantial evidence of record. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 10.) First, Hill argues that the ALJ erred in relying on evidence which had not been made a part of the record for the court's review. (Plaintiff's Brief at 11.) Second, Hill argues that the ALJ erred in failing to accord proper weight to the opinion of Hill's treating psychiatrist. (Plaintiff's Brief at 11-16 .) Third, Hill argues that the ALJ erred in ignoring the opinion of the Commissioner's consultative examiner. (Plaintiff's Brief at 16-18.) Fourth, Hill argues that he did suffer from documented impairments that are capable of producing disabling pain. (Plaintiff's Brief at 18-22.) Fifth, Hill argues that the Commissioner failed to sustain her burden of establishing that there was other work in the national economy that Hill could perform. (Plaintiff's Brief at 22-24.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the

Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Hill argues that the ALJ erred in relying on evidence which had not been made a part of the record for the court's review. (Plaintiff's Brief at 11.) After a review of the record, I find that the ALJ did not rely on any evidence that was not included in the record. The ALJ merely summarized the existence of other evidence to explain the background of Hill's claim. Furthermore, since the regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity, *see* 20 C.F.R. § 404.1513 (e), 416.913(e) (2005), the record does not need to be supplemented to account for documentation of Hill's prior claim or a 1997 MRI study referenced by Dr. Iosif.

-29-

Hill further argues that the ALJ erred in failing to accord proper weight to the opinion of Hill's treating psychiatrist. (Plaintiff's Brief at 11-16 .) The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2005). However "circuit precedent does not require that a treating physician's testimony be given controlling weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. When the ALJ does not give the treating source's opinion controlling weight, the ALJ applies the following factors to determine what weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

I find that substantial evidence supports the ALJ's treatment of Dr. Forester's opinion. The ALJ assigned Dr. Forester's opinion little weight after finding that the opinion was inconsistent with the psychologist's own clinical findings and the record as a whole. (R. at 27-28.) The ALJ noted that Dr. Forester found Hill's behavior cooperative, his speech normal, his affect appropriate, his thought process goal-oriented and his orientation normal, yet found Hill completely or seriously limited in

-30-

all work-related activities. (R. at 27, 271-73.) Furthermore, Dr. Forester arrived at these conclusions at Hill's initial psychiatric evaluation – before a treatment relationship was formed would entitle Dr. Forester's opinion to a grater amount of deference. (R. at 204, 271-273.) The ALJ also found Dr. Forester's opinion inconsistent with Dr. Patel's assignment of a GAF score of 60, which indicated that Hill had only moderate symptoms and was only one point below having a mild level of impairment. *See* DSM-IV at 32. (R. at 28, 152.) Moreover, the reviewing state agency psychologists, who had reviewed the assessments of both Dr. Forester and Dr. Patel, identified only moderate mental limitations on Hill's ability to perform work-related activities. (R. at 164-87.) The ALJ ultimately accepted the limitations of the state agency psychologists to determine Hill's RFC. (R. at 20-28.)

Hill also argues that the ALJ erred in ignoring the opinion of Dr. Iosif, the Commissioner's consultative examiner. (Plaintiff's Brief at 16-18.) As stated earlier, in determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.,* 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano,* 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a

-31-

whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health , Educ. & Welfare*, 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

I find that the ALJ properly considered all relevant evidence in the record, and consequently, did not ignore Dr. Iosif's opinion. The ALJ thoroughly discussed Dr. Iosif's opinion in the body of his decision and specifically noted Dr. Iosif's assessment of Hill's physical capabilities. (R. at 20-21.) In fact, the ALJ's ultimate conclusion that Hill was capable of a wide range of light work is not significantly different from Dr. Iosif's conclusion that Hill could stand for up to one hour at a time, sit for between one and two hours with breaks for body position changes and could lift and carry items weighing up to 10 pounds frequently and up to 25 pounds occasionally. (R. at 28, 142.) The ALJ, however, accepted the opinions of state agency physicians who concluded that Hill could lift and/or carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently and could sit, stand and/or walk about six hours each in an eight-hour workday as more consistent with acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other evidence from treating and examining sources. (R. at 27.) The ALJ found that Hill's allegations of being unable to sit, walk or stand for more than a short period of time inconsistent with Hill's ability to drive without a handicapped parking tag. (R. at 27.)

Hill next argues that the he does suffer from documented impairments that are capable of producing disabling pain. (Plaintiff's Brief at 18-22.) I find that the ALJ considered Hill's allegations of pain in accordance with the regulations. The Fourth

Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment, which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d at 594. Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers....

76 F.3d at 595.

I find that substantial evidence supports the ALJ's finding that Hill's subjective complaints of disabling functional limitations were not entirely credible. The ALJ acknowledged that Hill did have an impairment that could reasonably be expected to produce some degree of pain. (R. at 26.) However, the ALJ determined that "[t]he lack of objective evidence and clinical findings in the record are out of proportion to the claimant's subjective complaints and do not support a conclusion that the

-33-

limitations are of an intensity, frequency, or duration as to preclude the performance of all work activity." (R. at 26.) In particular, the ALJ noted that Hill had been found capable of performing a wide range of light work on numerous occasions. (R. at 26, 142, 154-63, 228, 259, 264, 286-87.) The ALJ also considered the fact that Hill continued to drive an automobile, declined more powerful pain mediation in order to continue driving and tended to magnify the severity of his symptoms. (R. at 26-27, 286-87, 290.) The ALJ then considered the objective medical evidence, which indicated that Hill's lungs and breathing were normal, despite Hill's refusal to quit smoking. (R. at 27, 141, 190-202.) The ALJ also noted that Hill's physician found Hill to be "alert, oriented, in no acute distress," while Hill complained of disabling pain and sleeplessness. (R. at 27, 283.) I find that the ALJ's conclusion that Hill's subjective complaints of disabling functional limitations were not fully credible is supported by substantial evidence.

Hill also argues that the Commissioner failed to sustain her burden of establishing that there was other work in the national economy that Hill could perform. (Plaintiff's Brief at 22-24.) Given Hill's age, education, work history and residual functional capacity, the vocational expert found that there were jobs that Hill could perform such as a bench assembler, of which there were 1,500 available jobs regionally and 76,000 nationally; a sorter/tester, of which there were 3,600 available jobs regionally and 155,000 nationally; and a packager, of which there were 4,300 available jobs regionally and 57,000 nationally. (R. at 29, 357-58.) The question posed to the vocational expert to elicit these potential jobs presupposed the ALJ's findings regarding Hill's physical and mental capabilities. (R. at 29, 357-58.) Since the ALJ properly rejected Dr. Forester's assessment, the ALJ had no reason to accept

-34-

the vocational expert's testimony that relied on that assessment. The vocational expert confirmed that many of the identified positions offer a sit/stand option and the use of a cane for walking would not preclude employment. (R. at 365.) Furthermore, Dr. McIlwain gave Hill the cane to use only when walking on uneven ground and simultaneously found that Hill was capable of light to moderate work (R. at 264.) As such, the Commissioner met her burden of production that there was other work in the national economy that Hill could perform.

*IV. Conclusion*

For the foregoing reasons, I will overrule Hill's motion for summary judgment, sustain the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

DATED:     This *17th* day of May 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE

-35-